

**SO ORDERED.**

**SIGNED this 26 day of December, 2024.**

_Robert M. Matson_

**Robert M. Matson**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 24-51245-RMM |
| | ) | |
| Christopher Mark Wilson | ) | |
| | ) | Chapter 11 |
| Debtor | ) | Subchapter V |
| | ) | |
| McGriff Insurance Services, LLC | ) | |
| | ) | |
| Movant | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Christopher Mark Wilson | ) | |
| | ) | |
| Respondent | ) | |

**MEMORANDUM OPINION ON MOTION TO DISMISS CASE AND**
**OBJECTION TO DEBTOR'S ELECTION UNDER SUBCHAPTER V**

Before the Court is the motion of McGriff Insurance Services, LLC ("McGriff")

to dismiss the Debtor's case pursuant to 11 U.S.C. § 1112(b) and its objection to the

Debtor's designation as a small business debtor and election under Subchapter V

pursuant to 11 U.S.C. § 1182 and Fed.R.Bankr.P. 1020(b).  This Court has subject

1

matter jurisdiction over these matters pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and the Amended Standing Order of Reference filed in the United States District Court for the Middle District of Georgia on February 21, 2012. These are both core proceedings pursuant to 28 U.S.C. § 157(b)(2)(A).

## PROCEDURAL BACKGROUND

The Debtor filed his bankruptcy petition on August 22, 2024, and elected to proceed under Subchapter V of Chapter 11.  The 341(a) meeting of creditors hearing was concluded on September 24, 2024.  On October 2, 2024, McGriff filed its Motion to Dismiss the Chapter 11 Bankruptcy Case Pursuant to Bankruptcy Code Sections 1112(b) and 1182; and to Extend the Deadline to File a Complaint Objecting to Discharge or Challenging Whether Debts are Dischargeable ("Motion to Dismiss") referenced as Doc 52.[1]  On October 24, 2024, McGriff filed its Objection to the Debtor's Designation as a Small Business Debtor and Election under Subchapter V ("Objection to Subchapter V Designation") referenced as Doc. 66.  On November 13, 2024, the Court held a hearing on the Motion to Dismiss and Objection to Subchapter V Designation and agreed to continue the hearing on McGriff's motion to extend the deadline to file a complaint objecting to discharge or the dischargeability of debt.  The Debtor, his attorneys and McGriff's attorneys attended the hearing in person, and the Subchapter V Trustee and Assistant United States Trustee appeared telephonically.  At the hearing, counsel for the Debtor and McGriff stipulated to the

---

[1] McGriff objected to the Debtor's eligibility to proceed under Subchapter V in the Motion to Dismiss.

admission of exhibits, and the Court heard lengthy testimony from the Debtor in opposition to the Motion to Dismiss and the Objection to Subchapter V Designation.

## **FINDINGS OF FACT**

The Debtor is an individual who resides in Macon, Georgia with his spouse. The Debtor and his spouse have two daughters; one is a junior in high school and the other attends college outside of the Macon area.  From 1998 until 2004, the Debtor was employed as a teacher and coach at a local private school.  In 2004, the Debtor changed careers and transitioned to the insurance business at the insistence of a close friend and the desire to make more money.   On September 1, 2004, the Debtor went to work as an insurance producer for BB&T Insurance Services, Inc. ("BB&T Insurance"), the predecessor in interest to McGriff.   An insurance producer essentially acts as a middleman between commercial business customers and insurance carriers.  The Debtor's job at McGriff was to sell commercial insurance products to new customers and maintain relationships with existing customers.   The Debtor specialized in assisting his customers with property and casualty insurance policies.

At the outset, the Debtor was paid a salary, but over time, the Debtor was paid strictly on a commission basis.  An insurance producer's customers are known as his or her "book of business", and an insurance producer's book of business is the measuring stick with the employer.  In addition, the Debtor's commission income is based on the size of his book of business. With McGriff, the Debtor was paid a

percentage of the insurance commission generated from the sale of each policy. McGriff paid producers a 40% commission on new business and 25% on renewals.

On January 14, 2010, the Debtor executed an employment agreement with BB&T Insurance. Section 17 of the employment agreement provides that the agreement will be governed by the substantive laws of North Carolina, and any action arising from or relating to the enforcement of the employment agreement shall be brought exclusively in the state court of Forsyth County, North Carolina or the United States District Court for the Middle District of North Carolina. The employment agreement has no provision for damages if there is a contract breach.

On October 31, 2022, the Debtor resigned from his employment with McGriff. On November 1, 2022, the Debtor accepted a position as a producer with Sanford Insurance, LLC ("Sanford").  When the Debtor resigned from McGriff, he was one of the top three insurance producers in McGriff's Macon office, and his highest annual compensation during his time at McGriff was $300,000. The Debtor had no ownership interest in McGriff, but he had the title of vice president.

The Debtor left McGriff for Sanford for several reasons including a change in philosophy at McGriff that emphasized the generation of new business, an opportunity to become an equity owner at Sanford and higher pay due to a more lucrative commission structure. The Debtor's employment agreement with Sanford executed on November 1, 2022, generally provides that his annual salary would be $350,000 for the first year with an automatic renewal for two additional years.  After that period, the Debtor would be paid on a more favorable commission structure at

Sanford, including a 50% commission on new commercial and casualty business and a 50% commission on renewals.  In addition to his increased pay and commission structure, the Debtor also acquired a 10% ownership interest in Sanford on November 1, 2022.  The Debtor participates in monthly board/partner's meetings at Sanford. The Debtor is also a senior vice-president at Sanford, and in addition to maintaining his own book of business, he also mentors younger producers.

When Wilson resigned from McGriff, his book of business was in excess of $1 million and consisted of approximately 50 clients.  Approximately 37 of the clients moved to Sanford.   McGriff was less than amused with the circumstances surrounding Wilson's departure and the exodus of approximately 37 clients and various other employees, so on March 7, 2023, McGriff filed a complaint against the Debtor in the General Court of Justice, Superior Court Division of Forsyth County, North Carolina referenced as Case No. 23 CVS 1189 (the "North Carolina Action"). McGriff's complaint asserted the following seven claims against the Debtor: (i) Breach of Contract – Solicitation of Customers; (ii) Breach of Contract – Solicitation of Employees; (iii) Breach of Contract – Confidentiality; (iv) Breach of Duty of Loyalty; (v) Conversion; (vi) Misappropriation of Trade Secrets; and (vii) Unfair and Deceptive Trade Practices. The complaint alleges inappropriate conduct by the Debtor while employed by McGriff and while he was at Sanford.  On April 7, 2023, the Debtor removed the North Carolina Action to the United States District Court for the Middle District of North Carolina (the "North Carolina District Court"), and the case is now referenced as 1:23-cv-00295-CCE-LPA ("District Court Action"). On April 14, 2023,

Case 24-51245-RMM   Doc 88   Filed 12/27/24   Entered 12/27/24 13:53:32   Desc Main
Document     Page 6 of 21


the Debtor filed his answer to the complaint. On September 6, 2023, the North Carolina District Court notified the parties that a jury trial would be held on November 4, 2024.

As the District Court Action proceeded, the attorney fees grew. Sanford was not contractually obligated to indemnify or cover the Debtor's attorney fees associated with the District Court Action. However, Sanford stepped up to cover the attorney fees because the Debtor was unable to afford them. After an unsuccessful mediation of the District Court Action and the fear of unending attorney fees, the Debtor first contacted David Bury of Stone & Baxter, LLP ("Stone & Baxter") on March 19, 2024, to discuss a bankruptcy filing.

The litigation in the District Court Action continued, and on April 1, 2024, McGriff filed a Motion for Partial Summary Judgment, seeking judgment as a matter of law in its favor on all but the claim for conversion. On April 1, 2024, the Debtor moved for summary judgment on all claims. The two cross-motions for summary judgment were fully briefed between April 1, 2024, and May 15, 2024, at which time they were submitted to District Court Judge Catherine Eagles for consideration. On July 23, 2024, Judge Eagles held a lengthy hearing on the two parties' cross-motions for summary judgment and McGriff's motion to amend. The Debtor attended the hearing on July 23, 2024. After the hearing, the Debtor was convinced that he should file for bankruptcy to stem the unsustainable attorney fees associated with the District Court Action, so he contacted Stone & Baxter in the beginning of August 2024 and engaged the firm on August 7, 2024. After the hearing on July 23, 2024, the

6

Debtor again attempted to settle the District Court Action. On August 20, 2024, a text order was entered in the District Court Action regarding an anticipated ruling on the pending summary judgment motions and motion to amend. The text order, which largely tracks Judge Eagles' comments at the July 23, 2024, hearing, provides:

> Counsel are advised that the Court expects to grant summary judgment for the plaintiff on certain aspects of the breach of contract claims, to dismiss the conversion claim, and to otherwise deny the cross motions for summary judgment and to deny the motion to amend. Within 5 days of the filing of the Order resolving the summary judgment motions, the parties SHALL exchange but not file proposed verdict sheets, proposed jury instructions, and a proposed Statement of Decided Facts consistent with the summary judgment order and in an appropriate format for submission to the jury. Counsel SHALL thereafter meet and confer, then exchange revised proposals, and meet and confer again, continuing as long as this is productive. The parties SHALL file a Joint Submission no later than September 16, 2024, reflecting the results of their work; either agreed-upon or dueling proposed Verdict Sheets and Statements. The Court expects to schedule a pretrial conference during the week of September 16 and counsel shall advise the case manager of any scheduling conflicts as soon as possible.

On August 22, 2024, Debtor filed his bankruptcy petition at the advice of counsel. The Debtor testified that he decided to file bankruptcy because he could not afford the cost of the trial of the District Court Action and filed a chapter 11 case instead of chapter 7 to "secure [creditors] some sort of payback". At the 341(a) meeting of creditors hearing, the Debtor testified that he filed the bankruptcy after 18 months of pretty intense litigation with McGriff and "based off of counsel".

On the petition date, the Debtor partook in a previously scheduled gambling trip to Las Vegas with his friends. The Debtor lost $3,500 on the gambling trip, but the Debtor's wife has apparently replaced the funds from her assets that are not property of the estate. Other than the admittedly bad optics of gambling on the

petition date, there has been no allegation that the Debtor filed false information related to his bankruptcy or failed to comply with any court order, rule or procedure.

On September 19, 2024, the Debtor filed his Schedules and Statement of Financial Affairs. The Debtor listed three secured creditors in schedule D totaling $315,270.54. Two of the claims are secured by the Debtor's principal residence, and the other claim is secured by the Debtor's 2024 BMW X5. As of the petition date, the Debtor was current on the two claims secured by his principal residence but was in arrears on the claim secured by his 2024 BMW X5. The Debtor listed three priority unsecured creditors in schedule E/F totaling $3,552.55 and twelve non-priority unsecured creditors in schedule E/F totaling $882,845. The Debtor listed McGriff in schedule E/F as a creditor with a balance of $335,085 arising from an alleged breach of employment agreement. The Debtor indicates the claim is disputed, but the Debtor does not indicate the claim is unliquidated or non-contingent. When examined on cross-examination how he came up with the amount of McGriff's claim in the schedules, the Debtor testified that his trial counsel in the District Court Action gave him the figure. At the 341(a) meeting of creditors hearing, the Debtor testified that at mediation, McGriff originally would settle for $15 million, and after six hours that number stopped at $8 [million]. The Debtor also listed Sanford in schedule E/F as a creditor with two claims; one claim with a balance of $493,419 for liabilities in connection with litigation with McGriff and another claim with a balance of $31,378 for a loan to the Debtor for legal fees. The Debtor indicates both Sanford claims are disputed. The Court takes judicial notice that the deadline for non-governmental

8

creditors to file a proof of claim was October 31, 2024, and nine proofs of claim were filed.   Sanford filed proof of claim no. 7 on October 29, 2024, in the amount of $547,147.86 for the advance of pre-petition attorney fees. [2]

The Debtor's income and expense schedules indicate large income and expenditures for a debtor in the Middle District of Georgia.  The Debtor's schedule I shows net monthly income of $19,794.42.  The Debtor has not received a distribution from Sanford for his ten percent ownership interest due to the attorney fees paid by Sanford on his behalf.  Schedule J shows a correspondingly high amount of monthly living expenses of $18,247.05.   The Debtor's schedule J contains a reservation of rights to modify the monthly living expenses in connection with his chapter 11 plan.

On November 12, 2024, the Debtor filed his plan of reorganization.   The plan provides for a payment of $178,741.57 to non-priority unsecured creditors over 36 months.  The plan has not been confirmed by the Court.

## CONCLUSIONS OF LAW

McGriff argues that the Court should dismiss the Debtor's case pursuant to 11 U.S.C. § 1112(b) because it was not filed in good faith.  McGriff also argues that the Debtor is ineligible to qualify as a debtor under subchapter V because 1) he was not engaged in commercial or business activities on the petition date, 2) he has not shown that not less than 50 percent of his debts arise from commercial or business activities and, 3) his debts did not arise from his commercial or business activities.  For the

---

[2] On December 5, 2024, Sanford amended its proof of claim to $648,857.86.

9

reasons stated below, the Court will deny the Motion to Dismiss and sustain the Objection to Subchapter V Designation.

**1) <u>Dismissal under 11 U.S.C. § 1112(b)</u>**

McGriff urges the Court to dismiss the Debtor's case for cause because it was not filed in good faith. McGriff advances four arguments as to why the case was not filed in good faith:

1) The filing of the bankruptcy case two days after the text order was entered in the District Court Action was done solely to evade the imminent order that would be entered against the Debtor.

2) The Debtor's pre-petition and post-petition conduct.

3) This is a two-party dispute, and the Debtor had few debts and little or no pressure from his other creditors.

4) The Debtor maintains a lavish lifestyle and is not an honest but unfortunate debtor.

11 U.S.C. § 1112(b)(1) provides that:

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(4) gives a non-exhaustive list of reasons for cause. Lack of good faith is not enumerated in section 1112(b)(4), but the Eleventh Circuit Court of Appeals has decided numerous cases regarding bad faith in the context of dismissal

under section 1112(b) and 11 U.S.C. § 707. *Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.),* 749 F.2d 670 (11th Cir. 1984); *Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va. (In re Phoenix Piccadilly, Ltd.),* 849 F.2d 1393 (11th Cir. 1988) (dismissal of chapter 11 cases filed to stop foreclosures); *In re Dixie Broadcasting, Inc.*, 871 F.2d 1023 (11th Cir. 1989) (dismissal of chapter 11 case filed to stop the entry of a judgment); *In re Piazza*, 719 F.3d 1253 (11th Cir. 2013) (dismissal of chapter 7 case where debtor avoided a judgment for two years, refused to make any payments on the judgment yet continued to pay debts of insiders and transferred thousands of dollars every month to his wife).

There is no particular test for determining whether a debtor has filed a petition in bad faith. Instead, courts may consider any factors which evidence 'an intent to abuse the judicial process and the purposes of the reorganization provisions' or, in particular, factors which evidence that the petition was filed 'to delay or frustrate the legitimate efforts of secured creditors to enforce their rights.' *In re Phoenix Piccadilly, Lt.,* 849 F.2d at 1394 (*citing In re Albany Partners, Ltd.,* 749 F.2d at 674). It is instead, a fact-intensive judgment that is subject to judicial discretion under the circumstances of each case. *In re Albany Partners, Ltd.*, 749 F.2d at 674. The moving party has the burden to establish that cause exists to dismiss the case. *In re 412 Boardwalk, Inc.*, 520 B.R. 126, 134 (Bankr. M.D. Fla. 2014). In evaluating a motion to dismiss under section 1112(b), all doubts should be resolved in favor of the debtor. *In re Chris-Marine U.S.A., Inc.*, 262 B.R. 118, 124 (Bankr. M.D. Fla. 2001).

McGriff first argues that the filing of the bankruptcy case two days after the text order was entered in the District Court Action was done solely to evade the imminent order that would be entered against the Debtor. The Eleventh Circuit has held that bad faith can be found when a petition is filed prior to the entry of an adverse ruling in a pre-petition legal proceeding. *In re Dixie Broadcasting, Inc.*, 871 F.2d 1023 (11th Cir. 1989). In *Dixie Broadcasting*, the Court found that the bankruptcy court did not err in determining there was cause to lift the stay when a debtor in good financial health filed a chapter 11 petition at a lunchtime recess to avoid a less profitable contract when a judge was about to enter an adverse ruling against the debtor in a state court action that had been pending for two years. *Id.* at 1026-1027. In addition to the timing of the filing, the bankruptcy court in *Dixie Broadcasting* also relied, in part, that the debtor was in good financial health, used the bankruptcy to avoid a contract that had become less profitable in light of a better purchase offer and the principal's statement to creditors that the petition was filed as a diversionary tactic and that the debtor was not in financial distress. *Id.* at 1027. In short, the debtor in *Dixie Broadcasting* filed the case to get out of a bad deal.

McGriff has not met its burden to establish that cause exists to dismiss the case for lack of good faith. Although the timing of the petition suggests the text order prompted the filing, the Debtor's unrefuted testimony indicates he consulted with Stone & Baxter in March of 2024 after the unsuccessful attempt to settle the District Court Action at mediation and again after the hearing on July 23, 2024. Unlike the Debtor in *Dixie Broadcasting*, the Debtor did not file his bankruptcy petition to get

12

him out of a bad deal.  Instead, the Debtor filed his bankruptcy petition to shield him from the mounting defense costs associated with the District Court Action and to repay his creditors through a restructuring.  *See, In re Chris-Marine, U.S.A., Inc.*, 262 B.R. at 124-125 (chapter 11 case should not be dismissed solely because a commercially viable debtor seeks to survive the ruinous effects of a single large judgment when the debtor has a prospect of reorganizing); *Staggs v. Kirk, (In re Kirk)*, 548 B.R. 597, 604 (Bankr. S.D. Ga. 2016) (court refused to dismiss a chapter 13 case for bad faith when the debtor made a quick decision to file bankruptcy to deal with a civil lawsuit when he had no liability insurance and could not afford to a pay a lawyer to defend the lawsuit).  As correctly pointed out by the Debtor, bankruptcies are often filed due to pending litigation, and the imposition of the automatic stay with respect to judicial proceedings is a natural consequence of a bankruptcy filing.  *See* 11 U.S.C. § 362(a)(1).

The Debtor's pre-petition and post-petition conduct are also not indicative of a level of bad faith to dismiss the case.  McGriff alleges the Debtor's pre-prepetition conduct including scheming with a competitor to steal McGriff's customers, employees and trade secrets indicates bad faith.  The Court dismisses this argument because there was no ruling as of the petition date in the District Court Action on the parties' summary judgment motions.  Furthermore, there is a procedure in place in the Bankruptcy Code for McGriff to file a complaint objecting to the Debtor's discharge or the dischargeability of the debt.

The Debtor's testimony indicates he made good faith efforts to settle the District Court Action. The Debtor attempted to settle the District Court Action by attending a mediation in March 2024 and again prior to filing this case. Unlike the debtor in *Piazza*, the Debtor engaged in meaningful settlement negotiations to resolve the District Court Action.

McGriff argues that the Debtor's post-petition conduct is indicative of bad faith. First McGriff argues the act of filing a motion to change venue filed in the District Court Action pursuant to 28 U.S.C. § 1412 is indicative of bad faith. The Court disagrees because a debtor's utilization of a statute authorized by Congress does not equate to bad faith. *See, In re Hageney*, 422 B.R. 254, 258 (Bankr. E.D. Wash. 2009) (there is no bad faith in maximizing a debtor's legal rights granted under the Code.) With respect to the gambling trip, the Court determines that this does indicate bad faith. The Court in no way condones a gambling trip to Las Vegas even if it was pre-planned and if any losses associated with the gambling trip were reimbursed by a non-debtor.

The Debtor's post-petition conduct does not indicate bad faith. With respect to other post-petition conduct, McGriff has not alleged any errors or omissions in the Debtor's Schedules, Statement of Financial Affairs or other documents filed with the Court. There is no allegation that the Debtor violated any rule or court order. It is also noted that the Debtor has already filed his plan of reorganization that proposes to pay over $178,000 to non-priority unsecured creditors over three years. The filing

14

of the plan indicates the Debtor is attempting to restructure his debts and not merely to hinder, delay or defraud his creditors.

McGriff next argues that this is basically a two-party dispute.  McGriff ignores Sanford's role as a creditor in this case.  The Debtor's testimony at the hearing and the 341(a) meeting of creditors hearing indicates Sanford is not required to indemnify the Debtor for the defense costs of the District Court Action.  The employment agreement with Sanford does not include any provision to indemnify or otherwise pay for the Debtor's defense costs in the District Court Action.  However, McGriff ignores a key fact.  Sanford sees itself as a creditor in this case evidenced by the filing of proof of claim no. 7 on October 29, 2024, in the amount of $547,147.86 for the advance of pre-petition attorney fees.  This is a substantial debt that the Debtor must deal with either in bankruptcy or otherwise.

Finally, McGriff argues that the case should be dismissed for bad faith because the Debtor is not an honest but unfortunate debtor.  The Court agrees that the Debtor's income is significantly higher than the average debtor in the Middle District of Georgia.  However, the possible entry of a seven-figure judgment in the District Court Action along with the associated defense costs owed to Sanford created a threat to the Debtor's assets and future income that does not equate to bad faith.

In summary, McGriff has not met its burden that the petition was not filed in good faith.

Case 24-51245-RMM   Doc 88   Filed 12/27/24   Entered 12/27/24 13:53:32   Desc Main
Document      Page 16 of 21

**2) Objection to Subchapter V Designation**

**a) The Debtor was engaged in commercial or business activities on the petition date.**

To be eligible to elect Subchapter V, a debtor must be a "small business debtor".

11 U.S.C. § 101(51D)(A) defines a small business debtor and provides that:

> The term "small business debtor"—
> …means a person engaged in commercial or business activities (including any affiliate of such person that is also a debtor under this title and excluding a person whose primary activity is the business of owning single asset real estate) that has aggregate noncontingent liquidated secured and unsecured debts as of the date of the filing of the petition or the date of the order for relief in an amount not more than $3,024,725 (excluding debts owed to 1 or more affiliates or insiders) not less than 50 percent of which arose from the commercial or business activities of the debtor;

The Debtor has the burden to prove that he is eligible for Subchapter V. *In re Ikalowych*, 629 B.R. 261, 275 (Bankr. D. Colo. 2021); *In re Carter*, 2023 WL 9103614, 2 (Bankr. N.D. Ga. Dec. 13, 2023). McGriff first argues that the Debtor was not engaged in commercial or business activities on the petition date since he was a W-2 employee at Sanford. The Debtor argues that he was engaged in commercial or business activities due to his ownership interest in Sanford and his managerial responsibilities at that entity. The starting point for interpreting the statute is the language of the statute itself. *In re Ikalowych*, 629 B.R. at 276. The term business or commercial activities has been broadly construed. *In re Robinson*, 2023 WL 2975630, 3 (Bankr. S.D. Miss. April 17, 2023). The Court agrees with the *Ikalowych* court that business or commercial activities means "any private sector actions related to buying, selling, financing, or using goods, property, or services, undertaken for the purpose of earning income (including by establishing, managing operating an

16

incorporated or unincorporated entity to do so).” *In re Ikalowych*, 629 B.R. at 276. There are several cases addressing whether an individual is eligible under Subchapter V when the debtor is a W-2 employee. Most are in the context of when a debtor who owned or operated a business that was no longer operating but still winding down the affairs of the business. *In re Ikalowych*, 629 at 286 (the court took a very broad reading and ruled that a debtor was engaged in commercial business activities by simply being a salaried employee as a “Commercial Insurance Producer” even though the debtor had no ownership interest in his current employer); *Contra, In re Rickerson*, 636 BR. 416, 426-427 (Bankr. W.D. Pa. 2021) (court declined to adopt the expansive holding in *Ikalowych* and held that a debtor's employment as a W-2 employee with no ownership interest, status as an officer or director, or managerial responsibilities with the employer are not commercial or business activities); *In re Johnson*, 2021 WL 825156, 8 (Bankr. N.D. Tex. March 1, 2021) (debtor was not engaged in commercial or business activities as a W-2 employee even though he was president of a non-debtor company).

The Court declines to adopt the broad holding in *Ikalowych* that all W-2 employees are engaged in commercial or business activities. However, the Court agrees that the term “commercial or business activities” should be broadly construed. *In re Robinson*, 2023 WL 2975630 at 3. Based on the broad construction of commercial or business activities, the Debtor was indeed engaged in commercial or business activities on the petition date. Unlike all of the debtors in the above referenced cases, the Debtor had far more responsibilities and connections to his

current employer.  The Debtor's roles at Sanford include insurance producer, senior vice president with managerial duties, mentor to young insurance producers, and having a ten percent equity ownership interest.  These responsibilities and duties indicate the Debtor was engaged in commercial or business activities at Sanford on the petition date.

The allegations in the complaint filed in the District Court Action also indicate the Debtor was engaged in commercial or business activities.  Although there has been no finding that the Debtor is liable to McGriff in the District Court Action, the allegations in the complaint indicate the Debtor was no "mere" W-2 employee at Sanford.  The counts in the complaint include (i) Breach of Contract – Solicitation of Customers; (ii) Breach of Contract – Solicitation of Employees; (iii) Breach of Contract – Confidentiality; (iv) Breach of Duty of Loyalty; (v) Conversion; (vi) Misappropriation of Trade Secrets; and (vii) Unfair and Deceptive Trade Practices. The gist of the allegations in the complaint is that the Debtor is in the insurance business, and he breached contractual and non-contractual duties on the business playing field when he left McGriff for Sanford.[3]  The Debtor was indeed a W-2 employee as of the petition date, but the allegations in the complaint indicate he was engaged in commercial or business activities at Sanford and not just a mere employee.

### b) The Debtor has not shown that not less than 50% of his debts arise from commercial or business activities.

To be eligible for Subchapter V, the Debtor has the burden of proving that not

---

[3] Doc. 69, Exhibit B, Complaint at ¶ 105, "Wilson's actions as described herein were in and affecting commerce."

less than 50% of his non-contingent, liquidated aggregate secured and unsecured debts arise from commercial or business activities. Debts to insiders are excluded in the calculation. 11 U.S.C. § 101(51D). The Debtor concedes that Sanford is an insider pursuant 11 U.S.C. § 101(31)(A)(iv), so the debt to Sanford is excluded from the calculation. 11 U.S.C. § 101(51D). Of the remaining debts listed in the schedules, the debt to McGriff is the only other debt that could arise from commercial or business activities. McGriff argues that its debt is not liquidated, so it should be excluded from the calculation. The Debtor argues that even though the District Court Action is still pending, he concedes that it is liquidated to the extent of $355,085, which is the amount listed in schedule E/F.

The Eleventh Circuit, in a chapter 13 case, instructs lower courts on how to determine whether a debt is liquidated or unliquidated in bankruptcy. *United Sates v. Verdunn*, 89 F.3d 799 (11th Cir. 1996). The debt at issue in *Verdunn* was a tax debt owed to the Internal Revenue Service. The debtor argued that a disputed tax debt was not liquidated. *Id.* at 800. The Eleventh Circuit disagreed and held that the vigorously disputed tax debt was liquidated. A liquidated debt is that which has been made certain as to amount due by agreement of the parties or by operation of law. *Id.* at 802. However, if the amount of the debt is dependent upon a future exercise of discretion, not restricted by specific criteria, the claim is unliquidated. *Id.*

The debt to McGriff is primarily a claim for breach of contract. The contract at issue is the employment agreement. The general rule is that debts of a contractual nature are "subject to ready determination and precision in computation of the

19

amount due" and are thus liquidated. *In re Hall*, 650 B.R. 595, 599 (Bankr. M.D. Fla. 2023). By contrast, tort claims are unliquidated. *Id.* This of course makes sense because parties can usually refer to the contract to determine the damages. However, claims arising from a contract are not always liquidated. *In re Burdock and Assoc., Inc.*, 662 B.R. 16, 20 (Bankr. M.D. Fla. 2024). In *Burdock and Associates*, the court found that a claim arising from a breach of a consulting agreement was unliquidated because the consulting agreement had no provisions that would allow one to calculate the claim. *Id.* Likewise, McGriff's claim is unliquidated. Similar to the consulting agreement in *Burdock and Associates*, the Debtor's employment agreement with McGriff has no language that allows for a ready determination and precision in computation of the amount due. *Id.* Instead, the McGriff debt is dependent upon a future exercise of discretion by the North Carolina District Court. Thus, the debt is unliquidated.

The Debtor argues that the listing of McGriff's claim as liquidated to the extent of $355,085 is a judicial admission, so the debt is liquidated by operation of law. The Debtor's bankruptcy schedules are not the only source of information to determine the amount of debt and whether the debt is unliquidated. Some courts review the schedules and the proofs of claim. *In re Zhang Medical P.C.*, 655 B.R. 403, 409 (Bankr. S.D. N.Y. 2023). McGriff's proof of claim was not admitted into evidence, so the Court will not review its proof of claim. However, the Debtor's testimony is instructive on whether the debt is liquidated. When asked how he came up with the number in the schedules, the Debtor testified that he got the number from his trial

counsel in the District Court Action. That explanation is insufficient to support the amount shown in the schedules. McGriff's claim is not subject to allow for a ready determination and precision in computation of the amount due. McGriff's debt is unliquidated, so it will not be included in the debt limit calculation. The Debtor has not met his burden that not less than 50 percent of his debts arose from commercial or business activities, so he is not a small business debtor pursuant to 11 U.S.C. § 101(51D) and is ineligible to proceed for relief under Subchapter V.

Since the Court finds that McGriff's debt is not liquidated, there is no need to rule on whether McGriff's debt arose from commercial or business activities of the Debtor.

## CONCLUSION

For the reasons stated above, the Court finds that McGriff has not shown that the Debtor's case was not filed in good faith. For the reasons also stated above, the Court finds that the Debtor has not shown that he is a small business debtor, so he may not proceed for relief under Subchapter V. The case shall proceed under the other applicable provisions of Chapter 11. The Court will enter orders consistent with this opinion.